UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

QUINTON PAUL HANDLON,

       Petitioner,

v.                            Case No:  2:16-cv-813-FtM-29UAM
                                  Case No. 2:13-CR-145-FTM-29CM

UNITED STATES OF AMERICA,

       Respondent.

_____

## OPINION AND ORDER

This matter comes before the Court on petitioner's Motion Under 28 U.S.C. Section 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Cv. Doc. #1; Cr. Doc. #149)[1] filed on November 4, 2016.  The government filed a Response to the motion (Cv. Doc. #25) on May 31, 2017.  The petitioner filed a Response to the government's Response (Cv. Doc. #27) on June 15, 2017.  For the reasons set forth below, the motion is denied.

Also before the Court are Petitioner's Motion for a New Trial Under Rule 33 (Cr. Doc. #163; Cv. Doc. #28), Motion to Request an Evidence Hearing (Cr. Doc. #166; Cv. Doc. #33), Petitioner's Motion to Compel (Cr. Doc. #165; Cv. Doc. #31), and Petitioner's Motions

_____

[1]The Court will refer to the docket of the civil habeas case as "Cv. Doc.", and will refer to the docket of the underlying criminal case as "Cr. Doc."

to Amend/add to Doc. # 1 Ground 4 Brady Claim (Cv. Docs. ## 39-40). For the reasons set forth below, the first three motions are denied, and the final motion is granted to the extent the Court has considered the Brady claim raised by petitioner as set forth below.

**I.**

On October 16, 2013, a federal grand jury in Fort Myers, Florida returned a three-count Indictment (Cr. Doc. #1) charging Quinton Paul Handlon (petitioner or Handlon) with production of child pornography (Count One), receipt of child pornography (Count Two), and possession of child pornography (Count Three). All three offenses were alleged to have occurred from approximately June 25, 2009 through February 2, 2013. Petitioner was obtained from state custody on a writ (Cr. Docs. ## 3, 4), and detained in federal custody without bond pending trial (Cr. Doc. #13).

The Federal Public Defender's Office filed a motion to suppress custodial statements made by petitioner to law enforcement officers. (Cr. Doc. #20.) Law enforcement officers had obtained a state arrest warrant for petitioner and a federal search warrant for premises in Tallahassee, Florida. After the completion of the search on May 8, 2013, officers recorded a statement by petitioner. The motion asserted that petitioner's

pre-Miranda[1] statement in response to a comment by an officer should be suppressed. The government opposed the motion (Cr. Doc. #27), and an evidentiary hearing was held on January 30, 2014. (Cr. Docs. ## 32, 35.) A Report and Recommendation (Cr. Doc. #34) recommended the motion be denied, and petitioner filed Objections (Cr. Doc. #37). On March 12, 2014, the district court overruled the objections, accepted and adopted the Report and Recommendation, and denied the motion to suppress. (Cr. Doc. #38.)

The trial date was continued three times on motion of petitioner. (Cr. Docs. ## 40, 43, 46.) On July 17, 2014, the government filed a Notice of Intent to Introduce Evidence as Child Molestation (Cr. Doc. #50). On July 28, 2014, petitioner filed a written Unopposed Motion to Continue Jury Trial (Cr. Doc. #52), which was granted and the trial set for September 2, 2014. (Cr. Docs. ## 55, 56, 58.) On August 11, 2014 the government filed an Amended Notice of Intent to Introduce Evidence as Child Molestation. (Cr. Doc. #57.)

On August 20, 2014, a federal grand jury in Fort Myers, Florida returned a three-count Superseding Indictment (Cr. Doc. #60) charging petitioner with production of child pornography from about June 25, 2009 through April, 2013 (Count One), coercing and

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

enticement of a minor to engage in sexually explicit activity from about June 25, 2009 through April, 2013 (Count Two), and possession of child pornography from about June 25, 2009 through about May 8, 2013 (Count Three). Petitioner pled not guilty to the Superseding Indictment and filed a motion for a continuance of the trial date. (Cr. Docs. ## 62, 63.) The government opposed a continuance (Cr. Doc. #64), but the district court granted petitioner's motion. (Cr. Doc. #65.)

On October 2, 2014, petitioner filed a Response to Government's Amended Notice of Intent to Introduce Evidence (Cr. Doc. #73) objecting to the admissibility of the evidence set forth in the government's Amended Notice.

On October 9, 2014, after a four-day trial, a jury convicted petitioner of all three counts in the Superseding Indictment. (Cr. Doc. #88.) Thereafter, petitioner's trial attorneys were allowed to withdraw, and attorney Allen S. Kaufman was appointed. (Cr. Docs. ## 102, 104, 105.) New counsel's motion to continue the sentencing was granted. (Cr. Doc. ## 108, 113.)

On June 5, 2015, the undersigned sentenced petitioner to concurrent sentences of 360 months imprisonment as to Count One, life imprisonment as to Count Two, and 120 months imprisonment as to Count Three, followed by concurrent life terms of supervised release. Judgment was filed on June 8, 2015. (Cr. Doc. #129.)

On June 18, 2015, the undersigned filed an Opinion and Order (Cr. Doc. #137) denying petitioner's *pro se* Motion for New Trial.

Petitioner filed a timely notice of appeal.  (Cr. Doc. #136.) Petitioner argued on direct appeal that the trial court erred in failing to suppress the incriminating pre-<u>Miranda</u> statement and that his life imprisonment sentence was unreasonable.  On August 10, 2016, the Eleventh Circuit Court of Appeals affirmed petitioner's convictions and sentences. <u>United States v. Handlon</u>, 667 F. App'x 989 (11th Cir. 2016); Cr. Doc. #147.

On November 4, 2016, petitioner filed his § 2255 motion (Cr. Doc. #149.)  The government concedes that the motion is timely filed (Cv. Doc. #25, pp. 2-3), and the Court agrees.

## II.

The thrust of petitioner's § 2255 motion is that the government framed him for the offenses of conviction, vindictively prosecuted him, and withheld exculpatory evidence, while his attorneys provided ineffective assistance of counsel by conspiring with the government and helping to cover up the government misconduct.  Because the record establishes the contrary, and none of the issues have legal merit, the § 2255 motion is denied.

### A. Summary of Record Facts

A "district court cannot grant relief in a § 2255 proceeding unless the movant meets his burden of showing that he is entitled to relief."  <u>In re Moore</u>, 830 F.3d 1268, 1273 (11th Cir. 2016).

After a conviction, the Court "views the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." United States v. Wright, 392 F.3d 1269, 1273 (11th Cir. 2004)(citation omitted).

The Court adopts the Statement of Facts set forth in the government's Response in Opposition as an accurate summary of the credible evidence:

> For about five years, Handlon sexually abused his underage niece, M.S., who was almost 30 years his junior. Doc. 116 at 36, 38, 51–52. When she was just 10 or 11, he put his finger in her vagina, had her put her mouth on his penis, and attempted multiple times to press his penis into her vagina, but she resisted because it hurt. Doc. 116 at 51–52. Handlon used his phone and video camera to take sexually explicit photographs and videos of M.S. Doc. 116 at 52–55, 78; Gov't Exs. 40–42, 53, 54, 62, 63. He took the earliest set of these pictures in June 2009, when he took M.S. and her brother to Disney World. Doc. 116 at 54– 55; Doc. 117 at 189; Gov't Exs. 40–44. There, he took the naked pictures of M.S in a hotel room, when she was just 11 years old.

> Handlon later took pictures of his penis touching M.S.'s vagina (Gov't Exs. 53, 54) and filmed videos of his sexual activity with her (Gov't Exs. 62, 62A, 63, 63A); Doc. 116 at 68– 69, 77–82, 86. In one of these videos, Handlon told M.S. several times, "Pull the panties off and slide on top," but M.S. first said, "I don't want to," and then repeated, "It's not going to work." Gov't Ex. 62, 62A. Handlon demanded that M.S. send him sexually explicit photographs in return for giving her a ride, money, or food. Doc. 116 at 49–50, 53, 60. He bought her alcohol and marijuana, Doc. 116 at

49-50, and tried to persuade her that what he was doing to her was okay by showing her a video entitled "Uncle and Niece" that depicted an old man having sex with a little girl, id. at 77-78. He allowed her to use his cell phone and his computer, then threatened to take them back if she did not repay him with sexually explicit photographs or sexual favors. Doc. 116 at 40, 49, 60-61, 63; Gov't Ex. 7 (Gmail_00129-30). She used his phone to take sexually explicit photographs and videos of herself, and either emailed them to him, or he uploaded the pictures onto his computer after she returned the cell phone. Doc. 116 at 65-66, 89. He also requested that M.S. send him videos. Doc. 116 at 86-87; Gov't Ex. 7 (Handlon_Extraction_00231).

Handlon purchased a "butt-plug" sex toy and gave it to M.S. Doc. 116 at 58-59. He told her to use it in her anus and vagina and to take pictures of herself using it. Doc. 116 at 59, 64. In 2012, after Handlon demanded naked pictures of M.S. and her friends, M.S. sent him a picture of her chest, and he responded by email, "[P]icture came through but really just a breast shoot? I was hop[ing] for a little toy in the kitty action?" Doc. 116 at 64; Gov't Ex. 7 (Gmail_00129). "Kitty" was the word he used to refer to her vagina, so she knew that he wanted a picture of her putting the anal plug in her vagina. Doc. 116 at 64-65. She eventually used his phone to take the pictures that he wanted. Doc. 116 at 59-60, 69-70.

In April 2013, when M.S. was 15, she asked her friend B.T. (also 15) to log into her email account to retrieve her Facebook password. Doc. 116 at 20, 23-24, 36, 95. When B.T. logged in, she saw Gmail emails from Handlon to M.S. demanding sexually explicit pictures of M.S. and their friend R., talking about sexual activity with R. in the back of a car, and discussing his plans to make a pornographic web site about M.S. Doc. 116 at 25-26, 28. She also saw an email demanding a picture of

M.S.'s little sister's "kitty." Doc. 116 at
25. M.S.'s friend knew that M.S. and her
kindergarten-aged sister did not have a cat;
from the context of the email, she understood
the word "kitty" to mean vagina. Doc. 116 at
22, 25. B.T. told her mother, who in turn
alerted the police. Doc. 116 at 31.

Officers took pictures of B.T.'s computer
screen with the emails that she had
discovered. Doc. 116 at 26-27, 31; Gov't Ex.
6. In one of those emails, which Handlon had
sent to M.S. less than a week before, he wrote,
"So where is my dirty girl with all her dirty
pictures she keeps telling me she will send
have you abandon me?" Gov't Ex. 6 at 1; Doc.
116 at 28. He asked when she would be "ready
for a few weeks away from home to cum up here
and play" with him: "I really really really
need to try out your tight ass at least 1 time.
If [R.] can do it I am know you can." Id. In
that same email, Handlon had asked if M.S. had
made up with R., adding, "Maybe while I am
back there next month the 3 of us can take a
little road trip you drive she and I fuck in
the back seat.. Sound good. I hope she likes
to moan.." Gov't Ex. 6 at 1.

In another email in late March 2013, he
described his plan to start an adult web site:
"We can do it as a Day in the life of [M.S.],
We can make videos and pictures. We can build
the site around you, As we build it and make
money we can add more and more girls till we
have a booming business." Gov't Ex. 6 at 3;
see also Doc. 116 at 94-95.

With M.S.'s permission, authorities took over
her email account and continued to correspond
with Handlon for about a week and a half before
arresting him on May 8, 2013. Doc. 35 at 8-
10, 15-16; Doc. 117 at 169-70. During this
time, they confirmed through surveillance that
Handlon was using this account, verifying that
his actual movements matched the emails he was
sending about when he was leaving work and
arriving home. Doc. 117 at 170-73. Agents also
obtained records from internet service

proviers to confirm that Handlon's emails
were being sent from his home and his office
in Tallahassee. Doc. 117 at 172-73. Agents
also learned that the zorrii@yahoo.com email
address that Handlon had used to correspond
with M.S. had been established in Handlon's
name in 2002 using his parents' address. Gov't
Ex. 4; Doc. 117 at 167-69.

During a search of Handlon's home, an agent
explained that for the week and a half
preceding Handlon's arrest, Handlon's emails
to his niece had actually been going to an
undercover agent. Doc. 35 at 5-7, 9-10, 15;
Doc. 117 at 183. Handlon remarked that he had
known it had not been his niece because she
had sounded different. Doc. 35 at 9, 15; Doc.
117 at 183. Officers found pornographic photos
of M.S., categorized by body part, as well as
pornographic videos of M.S, in Handlon's
apartment on various types of electronic
storage devices. Doc. 117 at 200-204.

(Cv. Doc. #25, pp. 3-6)(footnotes omitted). Additional facts will

be set forth below as appropriate.

### B. Analysis of Petitioner's Claims

Petitioner raises four numbered claims in his § 2255 motion.

Because the claims of a *pro se* petitioner must be liberally

construed, the Court also addresses other claims which are embedded

in the §2255 motion.

### (1)  Ground One: Fourth Amendment Violation

Petitioner asserts that when police officers responded on

April 14, 2013, they were shown what was purported to be sexually

explicit emails between petitioner and M.S.  Because he could not

print them, the officer took pictures of the items.  Petitioner

asserts these photographs establish that the items were texts from a Facebook account, not emails. On April 16, 2013, officers accessed M.S.'s Gmail account and retrieved a number of emails which had been written between October 2012 and March 2013. Beginning April 23, 2013, law enforcement officers took over M.S.'s Gmail account pretending to be M.S., and engaged in communication with petitioner's Yahoo account during what petitioner characterizes as "a unlawful electronic mail sting." (Cv. Doc. #1-1, p. 11.) "What made it unlawful was a violation of my 4th Amendment Right, they had no probable cause to target me in the first place." (Id.) The lack of probable cause, petitioner asserts, is premised on a variety of factors, including misconduct and/or incompetence by the officers, a conspiracy between the officers and the victim and others, and the failure of officers to make a legitimate connection to him or his email account. (See Cv. Doc. #1, p. 4; Cv. Doc. #1-1, p. 1-2, 8-12; Cv. Doc. #27, pp. 4-5.)

### (a) Procedural Default

The government first asserts that this issue is procedurally defaulted because the Fourth Amendment issue was not raised on direct appeal and there is no exception which excuses the failure to do so. (Cv. Doc. #25, pp. 7-10.) The Court agrees that the Fourth Amendment issue was available at the time of the direct appeal, that it was not raised on direct appeal, and that

petitioner has established neither cause nor prejudice for failing

to do so, nor a miscarriage of justice or actual innocence.

Further, petitioner has failed to establish ineffective assistance

of counsel for failing to assert meritless Fourth Amendment issues.

The Court finds that the issue is procedurally barred, but will

discuss the merits in the alternative.

**(b)    Merits of Fourth Amendment Claim**

The Fourth Amendment to the Constitution provides, "The right

of the people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures, shall not be

violated, and no Warrants shall issue, but upon probable cause

...." U.S. Const. amend. IV.  Additionally,

> [i]n order for Fourth Amendment protections to
> apply, the person invoking the protection must
> have an objectively reasonable expectation of
> privacy in the place searched or item seized.
> To establish a reasonable expectation of
> privacy, the person must show (1) that he
> manifested a subjective expectation of privacy
> in the item searched or seized, and (2) a
> willingness by society to recognize that
> expectation as legitimate.

Rehberg v. Paulk, 611 F.3d 828, 842 (11th Cir. 2010), aff'd, 566

U.S. 356 (2012)(citations omitted).  Applying these principles,

it is clear petitioner's Fourth Amendment rights were not violated

in this case.

Officers do not need probable cause to focus an investigation

on a particular individual, since merely focusing on an individual

is neither a search nor a seizure. In any event, whether the photographed documents were emails or texts, the information given to the officers was ample to establish probable cause to investigate and arrest petitioner.

> To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules, [i]t requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. Probable cause is not a high bar.

District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018)(citations and punctuation omitted). Law enforcement officers are permitted to rely on information obtained from victims and citizens to establish probable cause.

> It is well established that police officers may generally rely on eyewitness accounts and victim statements to establish probable cause. See Rankin v. Evans, 133 F.3d 1425, 1441 (11th Cir. 1998) ("[A]n officer is entitled to rely on a victim's criminal complaint as support for probable cause."). See also Myers v. Bowman, 713 F.3d 1319, 1323, 1326-27 (11th Cir. 2013) (finding a theft victim's complaint sufficient to establish probable cause); Jordan v. Mosley, 487 F.3d 1350, 1353, 1355 (11th Cir. 2007) (eyewitness statements led an objectively reasonable officer to believe the plaintiff committed a crime); L.S.T., Inc. v. Crow, 49 F.3d 679, 684-85 (11th Cir. 1995)

(finding probable cause based on the "victim's complaint and his identification" with other eyewitnesses statements).

Bright v. Thomas, 754 F. App'x 783, 787 (11th Cir. 2018).

Additionally, petitioner had no reasonable expectation of privacy in the emails/texts after they were sent to M.S., and no Fourth Amendment right of his was implicated when the items were shown to law enforcement officers.

> The Supreme Court "consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." Smith v. Maryland, 442 U.S. 735, 743–44, 99 S. Ct. 2577, 2582, 61 L. Ed. 2d 220 (1979). "[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." United States v. Miller, 425 U.S. 435, 443, 96 S. Ct. 1619, 1624, 48 L. Ed. 2d 71 (1976).

Rehberg, 611 F.3d at 842–43.

Even if petitioner had an expectation of privacy in the contents of M.S.'s account, M.S.'s consent renders the police access and copying lawful. "One exception [to the warrant requirement] is that a warrantless search is lawful when a person with actual or apparent authority voluntarily consents to law enforcement officers conducting a search." United States v. Thomas, 818 F.3d 1230, 1239–40 (11th Cir. 2016)(citations omitted). But petitioner had no reasonable expectation of

privacy, and hence no Fourth Amendment rights, in the contents of
M.S.'s stored emails. As noted above, the Supreme Court
"consistently has held that a person has no legitimate expectation
of privacy in information he voluntarily turns over to third
parties." Smith, 442 U.S. 735, 743-44.

On April 23, 2013, officers took over M.S.'s email account
and continued to correspond with the person M.S. had said was
petitioner. Petitioner's communications by email to a person he
believed was M.S., but who was in fact a law enforcement officer,
do not implicate the Fourth Amendment. Petitioner had no
reasonable expectation of privacy in what he disclosed to another.
Smith, 442 U.S. 735, 743-44. In any event, petitioner repeatedly
asserts he did not send the emails ("the evidence show Petitioner
could not have sent the emails and any such claim would be false
or misleading." Cv. Doc. #27, p. 1; "I could not have been the
sender of either the Facebook Text Messages or the emails found in
the Gmail account." Id., p. 4; "As I have said I didn't write them
emails" Id., p. 7). Therefore, petitioner would have no
reasonable expectation of privacy in the communications which he
asserts were between two other people, even though the evidence
was introduced against him. Rakas v. Illinois, 439 U.S. 128, 133-
34 (1978); Alderman v. United States, 394 U.S. 165, 174 (1969).

Because petitioner's Fourth Amendment rights were not
violated, Ground One is denied on the merits even if it is not

procedurally defaulted.

**(2) Ground Two: Bad Faith Destruction of Email Evidence**

Petitioner argues that there was a bad faith destruction of relevant Gmail evidence.  Petitioner asserts that on April 16, 2013, police collected the user name and password to M.S.'s Gmail account and informed her that the police would be reading the contents to build a case.  Petitioner asserts that "the Gmail user" deleted emails sometime between April 16 and 17, 2013, and police had made no effort to secure the account or recover the deleted Gmail evidence.  Petitioner also argues that when police made copies of the stored emails they copied only the body page and not the index page, where the original sender's IP address can be found.  With the IP address, petitioner asserts, he could prove he never sent the emails and who really sent the emails. Petitioner also asserts the Florida "best evidence" rule applies, and that he has an alibi for the time one of the emails was sent. (See Cv. Doc. #1, pp. 5-6; Cv. Doc. #1-1, pp. 1, 9-10; Cv. Doc. #27, pp. 5-6.)

**(a) Procedural Default**

The government first asserts that this issue is procedurally defaulted because the improper destruction of email evidence issue was not raised on direct appeal and there is no exception which excuses the failure to do so.  (Cv. Doc. #25, pp. 7-10.)  The Court agrees that this issue was available at the time of the

direct appeal, that it was not raised on direct appeal, and that petitioner has established neither cause nor prejudice, nor a miscarriage of justice or actual innocence. Further, petitioner has failed to establish ineffective assistance of counsel for failing to assert this issue. The Court finds that the issue is procedurally barred, but will discuss the merits in the alternative.

**(b)    Merits of Bad Faith Destruction of Evidence Claim**

In criminal cases, courts have developed law regarding a defendant's "constitutionally guaranteed access to evidence." Arizona v. Youngblood, 488 U.S. 51, 55 (1988) (quotation omitted). Destruction of, or failure to preserve, relevant evidence by law enforcement officers may violate due process. Whether there was a due process violation as a result of the government's destruction of evidence or failure to preserve evidence is a mixed question of law and fact. United States v. Revolorio-Ramo, 468 F.3d 771, 774 (11th Cir. 2006). As the Eleventh Circuit has summarized:

> To establish that the destruction of evidence constitutes a violation of due process, [a] defendant must show that the evidence was likely to significantly contribute to his defense. This means that the evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. The defendant must also demonstrate that the government acted in bad faith.

United States v. Wilchcombe, 838 F.3d 1179, 1191–92 (11th Cir. 2016)(internal citation and punctuation omitted); see also United States v. Hernandez, 864 F.3d 1292, 1306–07 (11th Cir. 2017).

Destruction of evidence by a private person, like a search by a private person, does not implicate the government unless the person acts as an instrument or agent of the government. United States v. Ford, 765 F.2d 1088, 1090 (11th Cir. 1985). To determine whether a private person is an agent of the government, the Court looks to: (1) whether the government knew of and acquiesced in the conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his or her own ends. United States v. Steiger, 318 F.3d 1039, 1045 (11th Cir. 2003)(citations omitted).

Petitioner alleges that on April 16, 2013, Detectives Joseph Sousa and Keven T. Connolly accessed M.S.'s Gmail account and printed the body of more than 300 emails between petitioner and M.S. from October 2012 to March 2013. (Cv. Doc. #1-1, p. 1.) On April 17, 2013, petitioner alleges that the officers again accessed this Gmail account and found that all the emails had been deleted. (Id., p. 10.) The government concedes that "[d]uring the investigation, law-enforcement authorities discovered that somebody had deleted emails from M.S.'s email account and had not preserved or collected the IP addresses associated with the emails.

. . ."  (Cv. Doc. #25, p. 13.)  Nonetheless, the government asserts that petitioner is not entitled to relief, and the Court agrees.

At trial, M.S. testified that she deleted the emails she sent to petitioner after they were sent because they were "not something I want to see."  (Cr. Doc. #116, p. 61.)  Margaret Fox, a computer forensic examiner with the Federal Bureau of Investigation, testified that the desktop computer seized from petitioner's residence was damaged in transit to the FBI's Tampa office.  (Cr. Doc. #117, p. 190.)  The hard drive inside the computer tower was sent to an FBI laboratory to attempt a repair, twice, but the FBI computer laboratory was unable to repair it.  (Cr. Doc. #117, pp. 190, 214.)  Ms. Fox explained the FBI process for handling and examining electronic devices in detail, including the devices involved in this case, and the contents found on the devices.  (Cr. Doc. #116, pp. 153-94; Doc. #117, pp. 6-161.)  There is no showing that any content was destroyed by police or someone acting as a police agent, as petitioner asserts.  Additionally, there is no evidence to show the existence of bad faith by any officer or any agent of the government either in deletion of emails or failure to copy an entire document.

Petitioner also relies on the Florida "Best Evidence" rule (Fla. Stat. § 90.952) (Cv. Doc. #1-1, p. 10), but this reliance is misplaced.  A Florida rule of evidence is not applicable to the investigative stage of state criminal matters, or to a federal

criminal prosecution.  Petitioner's reliance on the federal "Best Evidence" rule is likewise misplaced.  The Federal Rules of Evidence control the admissibility of documents at trial, and in the absence of bad faith would not preclude the admission of exhibits.  United States v. Lanzon, 639 F.3d 1293, 1301-02 (11th Cir. 2011).

Petitioner suggests that after assuming control of M.S.'s email, the officers manipulated his account and were communicating with someone other than himself.  The evidence at trial established otherwise, and petitioner's speculation is insufficient.  Agent Tissot testified at trial that during this time officers confirmed through surveillance that petitioner was using the email account, and verified that petitioner's actual movements matched the emails he was sending about his movements. (Cr. Doc. #117, pp. 170-173.)  Agents also obtained records from internet service providers to confirm that petitioner's emails were being sent from his home and his office in Tallahassee. (Id., pp. 172-173.)  Agents also learned that the email address that petitioner had used to correspond with M.S. had been established in his name in 2002 using his parents' address. (Gov't Ex. 4; Cr. Doc. #117, pp. 167-169.)  Upon executing the search warrant, agents told petitioner that for several weeks he had actually been emailing an undercover agent, not M.S., and petitioner responded "that he knew he wasn't e-mailing [M.S.], because she wouldn't

talk like that." (Cr. Doc. #117, pp. 183-184.)  This, along with
much of the forensic evidence obtained by Ms. Fox, confirmed that
petitioner was using the Zorrii@yahoo.com address.

M.S. testified to the content of a February 14, 2013 email
written to her by petitioner using the Zorrii address.  (Cr. Doc.
#116, pp. 87-88.)  Petitioner asserts that he has an alibi for
that email since he was driving his sister Deborah Handlon to
school several days a week, including the Thursday night in
question around 7:20 p.m. (Cv. Doc. #1-1, p. 10.)  Petitioner's
self-serving affidavit asserting an alibi for the time of one email
is insufficient to establish intentional bad faith by any officer
or an alibi for any of the charged offenses.  As the government
notes (Cv. Doc. #25, p. 14), even without this email, there is
ample evidence supporting the jury's verdicts.  Because petitioner
has failed to establish intentional misconduct or bad faith by any
law enforcement officer or government agent, he has suffered no
due process violation.  Ground Two of petitioner's § 2255 motion
is denied.

**(3)  Ground Three:  Ineffective Assistance of Counsel**

Petitioner asserts that trial counsel and appellate counsel
were ineffective because they refused to raise certain issues or
investigate certain matters, and effectively aided the government
and were parties to a conspiracy to commit fraud upon the Court.
Petitioner asserts at various places in his documents that he was

the victim of an extensive conspiracy to wrongfully prosecute him. Petitioner asserts the conspiracy included the police, the victim, friends and family of the victim, prosecutors, and his defense attorneys. Petitioner also asserts that Assistant Public Defenders James Lappan and Martin DerOvanesian helped to coverup this conspiracy by performing well below Sixth Amendment standards in multiple ways. (Cv. Doc. #1-1, pp. 2-3.)

Read liberally, petitioner alleges that his trial counsel and/or appellate counsel provided ineffective assistance by: (1) not collecting deleted Gmail emails; (2) not investigating and presenting physical evidence to show that the photographs taken by the deputy were taken hours before being called out; (3) failing to show that the items photographed were not emails but were Facebook text messages; (4) refusing to investigate an alibi for the February 14, 2013 7:20 p.m. email; (5) withholding FBI sting emails of April 23, 2013 which show the FBI changed the name of petitioner's Zorrii account to QH; (6) lied to petitioner by saying there was no reason to seek deleted emails because the email service provider no longer post the IP address on them; (7) failing to investigate a claim by the FBI that the root hard drive was damaged by the FBI while in transport to the Tampa office; (8) failing to pursue where missing hard drives found post-trial were for the 18 months before being found by the government's computer expert Ms. Margaret Fox, and failing to look for a MS Word document

with the 5 IPs he found connected to his computer, which showed hacking; (9) refusing to investigate petitioner's claim the Master Record File could be edited to make a file disappear and his computer was being hacked; (10) failure to assert a claim for prosecutorial vindictiveness by charging Handlon with a more severe offense in the superseding indictment and failing to include all offenses charged in the original indictment in the superseding indictment; (11) failing to consider use of a photograph of petitioner's penis to establish that his penis was significantly larger than the one depicted in the government exhibits. (Cv. Doc. #1, pp. 4, 6, 7; Cv. Doc. #1-1, pp. 2-3, 6, 12.)

**(a)  Legal Standards**

The legal standard for ineffective assistance of counsel claims in a habeas proceeding is well established.  To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must demonstrate both that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness and (2) prejudice resulted because there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different.  See <u>Hinton v. Alabama, 571</u> U.S. 263, 272-73 (2014) (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 694 (1984) and <u>Padilla v. Kentucky</u>, 559 U.S. 356, 366 (2010)).  "Because a petitioner's failure to show either deficient performance or prejudice is fatal to a <u>Strickland</u> claim, a court

need not address both Strickland prongs if the petitioner fails to satisfy either of them." Kokal v. Sec'y, Dep't of Corr., 623 F.3d 1331, 1344 (11th Cir. 2010) (citations omitted).

The proper measure of attorney performance is "simply reasonableness under prevailing professional norms" considering all the circumstances. Hinton, 571 U.S. at 273 (internal quotations and citations omitted). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (stating courts must look to the facts at the time of counsel's conduct). This judicial scrutiny is highly deferential, and the Court adheres to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. See Strickland, 466 U.S. at 689-90.

To be objectively unreasonable, the performance must be such that no competent counsel would have taken the action. See Rose v. McNeil, 634 F.3d 1224, 1241 (11th Cir. 2011); see also Hall v. Thomas, 611 F.3d 1259, 1290 (11th Cir. 2010). Additionally, an attorney is not ineffective for failing to raise or preserve a meritless issue. See United States v. Winfield, 960 F.2d 970, 974 (11th Cir. 1992); see also Ladd v. Jones, 864 F.2d 108, 109-10

(11th Cir. 1989).

The same deficient performance and prejudice standards apply to appellate counsel.  See Smith v. Robbins, 528 U.S. 259, 285-86 (2000); see also Roe, 528 U.S. at 476-77.  If the Court finds there has been deficient performance, it must examine the merits of the claim omitted on appeal.  If the omitted claim would have had a reasonable probability of success on appeal, then the deficient performance resulted in prejudice.  See Joiner v. United States, 103 F.3d 961, 963 (11th Cir. 1997).  Counsel is not deficient for failing to raise non-meritorious claims on direct appeal.  See Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1144-45 (11th Cir. 2005).

### (b)  Merits of Ineffective Assistance Claims

#### (1)  Conspiracy-Related Claims

Most of petitioner's claims of ineffective assistance of counsel are founded on the purported existence of a broad conspiracy which eventually included his attorneys.  Petitioner argues that his attorneys not only failed to expose and thwart the conspiracy, but ultimately became part of the conspiracy.  The record establishes otherwise.

Petitioner asserts that the conspiracy against him began on April 14, 2013, when Deputy Davoli was dispatched to Ms. Thibeault's residence in response to the pictures of M.S. found on her computer.  Petitioner asserts that shortly after his arrival

Deputy Davoli entered into a conspiracy to create a false and misleading police report alleging a capital criminal sex offense against petitioner. Petitioner asserts that the time recorded on Deputy Davoli's digital camera when he took the photographs of the computer screen was April 14, 2013 at 7:04 p.m., but that Deputy Davoli was not dispatched to the house until April 15, 2013 at 12:43 a.m., hence there must be a conspiracy. (Cv. Doc. #1-1, p. 9.)

Petitioner asserts that what Deputy Davoli observed on the computer screen were Facebook text messages, not emails. (Id.) Deputy Davoli could not risk printing the screens, petitioner asserts, because the printed copy would establish they were Facebook text messages, not emails. (Id. at 9.) Petitioner asserts the Deputy must have been friends of Thibeault because he was at the residence at 7 p.m., and knowingly made a false police report as to the time he took the photographs so as to "boost his job performance by such a high profile case." (Id.)

Petitioner asserts that the conspiracy continued on April 16, 2013, when Detectives Sousa and Connolly accessed M.S.'s Gmail account, printed the body of more than 300 emails, and then discovered on April 17, 2013, that all the emails had been deleted. Petitioner asserts the officers willfully ignored the common police policy of collecting the Index Page, which contained the original sender's IP address, and then allowed the emails to be

destroyed.  These documents would have shown that petitioner was not the sender of the emails.  (Cv. Doc. #1-1, pp. 9-10.)

The conspiracy continued, petitioner asserts, when on April 22, 2013, FBI Task Force Agents Jodie Page and Judy A. Payne used their computer skills to change a Gmail address contact connected to his Zorrii Yahoo email address from Paul to QH to create a known false link between petitioner and the Facebook account QH seen in Deputy Davoli's April 14, 2013 photo.  (Cv. Doc. #1-1, p. 2.) Additionally, petitioner asserts that "someone with law enforcement destroyed the Excel File, MS Word Doc, and all traces of the "WhoIs" program."  (Cv. Doc. #1-1, p. 12.)  Petitioner asserts that his attorneys failed to pursue the various computer-related aspects of the case, to petitioner's detriment.

As the government correctly states, petitioner essentially asserts "due-process violations arising from law enforcement's purported manipulation or fabrication of evidence to frame Handlon."  (Cv. Doc. #25, p. 11.)  The evidence establishes petitioner has not satisfied his burden of establishing either a due process violation or ineffective assistance of counsel in their handling of the various components of the alleged conspiracy.

Despite petitioner's speculation, the record establishes no conspiracy at any point during the investigation or prosecution, and his speculation as to the existence of such a conspiracy is insufficient to carry his burden.  The trial testimony established

that the case began when M.S. asked her friend B.T. to go on her email to get her Facebook password. Using M.S.'s laptop computer, B.T. found M.S.'s password for Gmail. When B.T. scrolled down, she saw emails from M.S.'s uncle to M.S. which were inappropriate. (Cr. Doc. #116, p. 25.) On cross-examination, counsel for petitioner asked B.T. if she was sure that these emails (Exhibit 6) were emails and not Facebook postings. (Id., p. 33.) B.T. confirmed that "Yes. They are e-mails." (Id.)

Government's Exhibit 6 is a picture of the emails on B.T.'s laptop. (Cr. Doc. #116, pp. 26-27.) B.T. identified the first email with "QH" in the top corner as being from petitioner Quinton Handlon because she had seen petitioner's full email address at the top of the email. (Id., pp. 27-28.) On cross-examination, counsel for petitioner asked B.T. if she concluded that petitioner was the author of the emails in Exhibit 6 because they came from the Zorrii email address, which B.T. knew to belonged to petitioner. B.T. responded "Yes." (Id., pp. 33-34.)

B.T. later informed her mother about the emails, and her mother called the police. None of the responding officers testified at petitioner's trial, and there are no facts which support a spontaneous conspiracy between those officers and the persons reporting the crime. Agent Christopher Tissot with the FBI's Child Exploitation Task Force summarized the basis for believing the emails had been authored by petitioner:

> Well, we have the victim saying -- telling us
> she did --that he did. We were able to show he
> uses e-mail account by subpoenaing his -- the
> IP address from the e-mail account from when
> he sent e-mail to the undercover agent. We had
> the screen shot, which was found on his
> external drive, which has his picture, the
> Zorrii e-mail tab opened up at the top of the
> page with four or five unread e-mail
> addresses, so the totality would show that,
> yes, he was the author of it.

(Cr. Doc. #117, p. 216.)

Counsel for petitioner extensively questioned forensic examiner Margaret Fox regarding the forensic examinations of the devices seized from petitioner's residence. No evidence supports any of the device-related shortcomings petitioner now suggests. The testimony established no conspiracy, and the record establishes that neither of petitioner's trial attorneys were involved in either the conspiracy or a cover-up. Rather, the record establishes that defense counsel proceeded as best they could with the compelling evidence in the case, and never waivered from their defense of petitioner. Petitioner has failed to show either deficient performance or prejudice resulting from any of his conspiracy-related claims.

### (2) Post-Trial Computer Hard Drives

Petitioner argues that his counsel did not investigate his theory that two hard drives government agents discovered after trial contained evidence that he had been the victim of hacking. The record supports the contrary finding.

Subsequent to trial and before sentencing, the government notified petitioner's counsel that they had discovered two additional functional hard drives in petitioner's computer. The United States filed the Government's Notice of Mistake of Fact At Trial and Motion to Toll Time for filing Post-Trial Motions (Cr. Doc. #93.) In the Notice, the government indicated that there were three hard drives in the desktop, and two of the three had not been inspected by Ms. Fox. A forensic examination of the new evidence showed that

> all child pornography images of the victim, previously located on external media devices seized from the defendant's possession, were also discovered in thumbnail form on the two newly discovered hard drives. In addition, evidence on the newly discovered hard drives revealed that a child pornography video of the victim, located prior to trial on an external hard drive (and used as evidence in trial), had been viewed numerous times on the Defendant's computer. Lastly, wiping software titled "Eraser" was located on one of the newly discovered hard drives.

(Cr. Doc. #97, p. 2.)

Petitioner's trial counsel retained a forensic expert to review the new evidence and help determine how to proceed. Id. In January 2015, two months after the government had provided the new discovery, petitioner's trial counsel announced that they would be ready to proceed to sentencing within 90 days. (Cr. Doc. #100.) Trial counsel then filed a motion to withdraw in February 2015. (Cr. Doc. #102.) On February 23, 2015, trial counsel was

permitted to withdraw, and Allen Kaufman was substituted as counsel of record. (Cr. Docs. ##104, 105.) From November 2014 to February 2015, trial counsel filed no motions challenging the conviction based on the new hard-drive evidence. Petitioner's new counsel likewise did not raise the new hard-drive evidence at sentencing or on appeal. At the sentencing hearing new counsel stated he would not be filing a post-trial motion for new trial for reasons he explained to petitioner, which were within the scope of attorney/client privilege. (Cr. Doc. #144, pp. 3-4.)

The record demonstrates that petitioner's counsel did in fact investigate the two hard drives, and nothing indicates that the new discovery contained any exculpatory evidence. Indeed, the description of the newly-found evidence was completely inculpatory. The decision not to file any post-trial motion about the matter is not ineffective assistance because petitioner has not shown that the failure to do so was unreasonable or that he suffered any prejudice.

### (3) Alibi As To One Email

Petitioner asserts that his counsel refused to investigate the "iron clad alibi" for the email of February 14, 2013 at 7:20 p.m. (Cv. Doc. #1-1, pp. 2, 10.) As noted above, this was one of many emails, and counsel was not deficient for failing to pursue the avenue petitioner now suggests. In light of the overwhelming evidence, evidence challenging the authenticity of this one email

would not have impacted the verdicts. Additionally, petitioner cannot show prejudice even if counsel could have attacked this email.

### (4) **Damage to Evidence In Transit to Tampa**

Petitioner argues that counsel failed to look into the claim of damage during transport to the Tampa Office of the FBI. The trial record establishes that the damage was established, petitioner's attorney was well-aware of the damage in transport, and used it to petitioner's advantage.

During opening statements, counsel for petitioner stated:

> Indeed, ladies and gentlemen, the hard drive from the desktop was so damaged that no data could be recovered from the desktop hard drive.
>
> And so the evidence will be that there is no way to tell whether any of the deleted images found on the external storage devices were actually ever viewed at all.

(Cr. Doc. #116, p. 17.) Special Agent Patrick Sanford, the lead agent in Tallahassee, Florida, testified that a computer tower seized from petitioner's residence on May 8, 2013 was damaged before it could be forensically analyzed.

> The computer examiner apparently took it downstairs to the . . . the table to be logged into evidence. We were out of the -- apparently, we were out of the antistatic bags, so he put it into a box . . . for it to be repackaged later before being shipped. Once he put it into the box, somebody mistakenly went ahead and taped it up with evidence tape, thinking it was ready to go.

(Cr. Doc. #116, p. 146.)  As a result, it was assumed that it was
ready to be shipped to Tampa.  (Id., p. 147.)  On cross
examination, Special Agent Sanford testified that he was informed
the computer tower arrived in Tampa damaged to the point it could
not be forensically analyzed.  (Id., pp. 148-49.)  The hard drive
inside the computer tower was sent to an FBI laboratory to attempt
a repair, twice, but the FBI computer laboratory was unable to
repair it.  (Id., pp. 190, 214.)  Margaret Fox, a computer
forensic examiner with the Federal Bureau of Investigation,
testified that the desktop computer was found to have been damaged
when the shipping box was opened in Tampa.  (Cr. Doc. #116, p.
190.)  Defense counsel cross examined Ms. Fox at length about the
damage.  (Cr. Doc. #117, pp. 83-96.)

During closing arguments, counsel for petitioner argued,
without any evidentiary basis:  "Our position is that the data and
the information from the desktop computer would have completely
exonerated Mr. Handlon."  (Cr. Doc. #118, p. 83.)

There was no basis to challenge the government's testimony
that the computer was damaged in-transit and the photographs of
the damage taken by Ms. Fox.  There is no suggestion that the
damage was done intentionally, or that anything on the computer
would have been beneficial to the petitioner.  Defense counsel
used the lack of access to the contents of this computer as

evidence of petitioner's innocence.  Counsel proceeded reasonably, and petitioner has suffered no prejudice.

### (5)  Prosecutorial Vindictiveness

Petitioner argues that he was subjected to prosecutorial vindictiveness when the government obtained a Superseding Indictment after he refused to plead guilty, and his attorneys failed to pursue this issue.  Petitioner asserts that he was shown a video at a pre-trial meeting between the government, himself, and his defense team, after which his attorney told him it was not too late to take a plea.  Petitioner told his attorney he would never take a plea to a crime he did not commit, and that he was not the male seen on the video shown by the government because the male organ of that person was much too small to be petitioner. (Cv. Doc. #1-1, p. 4, 14.)

Soon thereafter, a Superseding Indictment (Cr. Doc. #60) was filed.  Count Two of the original Indictment (knowingly receiving child pornography in violation of 18 U.S.C. § 2252(a)(2) and (b)(1), which carries a 20-year maximum sentence) was dropped. Added was a count of knowingly persuading, inducing, enticing, and coercing M.S. to engage in sexual activity for which defendant could be charged with a criminal offense under Florida Statutes in violation of 18 U.S.C. § 2422(b), which carries a potential life sentence.

Petitioner asserts that the Superseding Indictment dropped the charge so the government could withhold the email which is the subject of his Brady claim. Petitioner alleges that "by dropping this charge I was denied my right to due process, so I could not raise the question w[h]ere are the 2 missing emails with the illegal child porn photo[s] and what was the wrong email address." (Cv. Doc. #1-1, pp. 4-5.) Additionally, petitioner asserts the new charge could and should have been brought in the original Indictment, and it increased the maximum penalty from 40 years to life as punishment for going to trial. (Id.)

There may be certain circumstances in which a defense of vindictive prosecution may prevail. As the Eleventh Circuit recently summarized:

> A prosecutor may seek a superseding indictment at any time prior to a trial on the merits, ... so long as the purpose is not to harass the defendant." United States v. Barner, 441 F.3d 1310, 1315 (11th Cir. 2006) (citation omitted). As a general rule, if a prosecutor has probable cause to believe that a defendant committed a crime, "the courts have no authority to interfere with a prosecutor's decision to prosecute." Id. A superseding indictment adding new charges that increases the potential penalty "would violate due process if the prosecutor obtained the new charges out of vindictiveness." Id. In this context, vindictiveness "means the desire to punish a person for exercising his rights." Id. We have explained that a "prosecutor's charging decision does not impose an improper 'penalty' on a defendant unless it results from the defendant's exercise of a protected legal right, as opposed to the prosecutor's

normal assessment of the social interests to be vindicated by the prosecution." <u>United States v. Taylor</u>, 749 F.2d 1511, 1514 (11th Cir. 1985) (per curiam).

. . .

The Supreme Court has recognized that the addition of charges while preparing for trial generally does not give rise to a presumption of vindictiveness because, "[i]n the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution." <u>United States v. Goodwin</u>, 457 U.S. 368, 381, 102 S. Ct. 2485, 73 L. Ed. 2d 74 (1982). In these circumstances, where the charges were added pre-trial, a defendant must prove actual vindictiveness by showing "objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do." <u>Id.</u> at 384, 102 S. Ct. 2485.

. . .

Davis argues that the new charges were added to punish him for not cooperating and that he had a protected right not to cooperate. Davis cites no authority suggesting that the government cannot use the threat of prosecution to encourage cooperation, and courts that have considered this issue have concluded otherwise. <u>See</u> <u>United States v. Williams</u>, 47 F.3d 658, 662 (4th Cir. 1995) ("A prosecutor's threat to bring a more severe indictment if the defendant refuses to cooperate does not amount to vindictiveness as long as the defendant, should he refuse to cooperate, is not treated worse than he would have been if no plea bargain had been offered."); <u>United States v. Long</u>, 823 F.2d 1209, 1211 (7th Cir. 1987) (noting that the government may penalize a refusal to cooperate and that "it is difficult to see how the mere allegation that Long was disadvantaged by refusing to cooperate could, without more, suffice to show 'vindictiveness'"); <u>United</u>

States v. Boss, 652 F.2d 36, 38 (10th Cir.
1981) ("When the party refuses to cooperate,
prosecution, based upon probable cause to
believe the defendant committed the crime
charged, does not present [a] likelihood of
vindictiveness").

United States v. Davis, 854 F.3d 1276, 1291–92 (11th Cir. 2017).

Here, petitioner has not satisfied his substantial burden.
The Amended Notice of Intent to Introduce Evidence as Child
Molestation Under Fed. R. Evid. 414(a), Res Gestae or in the
Alternative Under Fed. R. Evid. 404(b) (Doc. #57) was filed just
before the Superseding Indictment was returned indicating that
testimonial evidence would be introduced from witness Matthew
Handlon that petitioner touched minor B.T. and minor C.L.'s
genitals, and that petitioner engaged in sexually explicit conduct
with M.S. on many occasions. The Indictment was superseded to add
knowingly persuading, inducing, enticing, and coercing M.S. to
engage in sexual activity in violation of 18 U.S.C. § 2422(b).
The prosecutor is not vindictive when bargaining or threatening to
bring additional charges if warranted and supported by the
evidence. The evidence of molestation was objectively available
to the prosecutor, and petitioner was not subjected to vindictive
prosecution.

### (6)  Size of Penis as Defense

Petitioner argues that counsel refused to look at the photo of him with ex-girlfriend Paula Wright showing his clearly larger penis compared to the one in a video.  (Cv. Doc. #1-1, p. 14.) This failure to consider and present testimony about penis size was, according to petitioner, ineffective assistance of counsel.

It is clear that counsel was not ineffective in failing to argue, or to present the evidence suggested by petitioner, that petitioner was not the person involved in any of the offenses because of the size of his penis.  The evidence was overwhelming that petitioner was the person involved in the charged offense, including the testimony of M.S. and the numerous items discovered on petitioner's devices.

### (4)  Ground Four:  **Brady** Violation

Petitioner argues that the FBI fabricated, altered, and/or withheld email communications with an unidentified third party; exculpatory email attachments were withheld by the government; and that the government violated petitioner's Fourth Amendment rights by targeting him without reason.  Petitioner filed two Motions to Amend/add to Doc. # 1 Ground 4 Brady Claim (Cv. Docs. ## 39-40) because he could not obtain copies of the FBI sting emails to show that the contact name on the Gmail was changed.  These motions will be granted to the extent that the argument relates back to the original filing.

Petitioner asserts a Brady[2] violation, arguing that the November 27, 2012, emails demonstrate there must have been additional emails with attachments that were not turned over to the defense. Petitioner argues that there are at least two emails that were withheld by the government that would have shown that he was innocent and not the author of the other emails. (Cv. Doc. #1-1, 4.)

During trial, the government presented evidence that petitioner had sent an email dated November 27, 2012, which M.S. read: "Ok picture came through but really just a breast shoot? I was hopen for a little toy in the kitty action? Any chance raven will be sending something tonight for me to jerk off to?" Gov't Ex. 7. M.S. replied, "Sheeeettt . . . I must've sent the to your wrong email. Hold on." (Cr. Doc. #116, p. 64; Gov't Ex. 7.) The officers, however, did not discover any corresponding emails containing child pornography in M.S.'s recovered emails.

Petitioner asserts that he became aware of the existence of these hidden emails when he received a Bureau of Prisons memorandum stating that the offense of his conviction "involved the extensive use of cell phones to communicate as well as photograph and transmit the illicit images through electronic mail." (Cv. Doc. 1-1, p. 11.) Petitioner contends that this BOP memorandum proves

---

[2] Brady v. Maryland, 373 U.S. 83 (1963).

that the government intentionally withheld email evidence. (Id., pp. 4-5.)

"To establish a Brady violation, the defendant must show that (1) the government possessed favorable evidence to the defendant; (2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different." United States v. Vallejo, 297 F.3d 1154, 1164 (11th Cir. 2002); see also United States v. Man, 891 F.3d 1253, 1276 (11th Cir. 2018). The burden to show a Brady violation lies with the defendant, not the government. Vallejo, 297 F.3d at 1164. "A reasonable probability of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial." Rimmer v. Sec'y, Fla. Dep't of Corr., 876 F.3d 1039, 1054 (11th Cir. 2017) (citation and internal quotation marks omitted). "[W]e must consider the totality of the circumstances" and "evaluate the withheld evidence in the context of the entire record" to determine whether the result would have been different. Id. (alteration adopted) (citations and internal quotation marks omitted). See also United States v. Elbeblawy, 899 F.3d 925, 936 (11th Cir. 2018).

Petitioner's <u>Brady</u> claim is without merit. There is no evidence that the government ever had additional email attachments which were not disclosed to the defense. The officers did not find such emails, and M.S. testified at trial that she had taken pictures on petitioner's cell phone and emailed them to petitioner, but deleted them after sending. (Cr. Doc. #116, pp. 60-61.) The Bureau of Prisons memorandum summarizing other documents provides no support for the claimed <u>Brady</u> violation. Petitioner has not shown the government suppressed anything. In any event, petitioner has failed to show that there is a reasonable probability that the outcome of his case would have been different. The items petitioner alleges were suppressed, after all, were more child pornography attributed to him. Accordingly, Ground Four is denied.

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1. Petitioner's Motion Under 28 U.S.C. Section 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Cv. Doc. #1; Cr. Doc. #149) is **DENIED**.

2. The Clerk of the Court shall enter judgment accordingly and close the civil file. The Clerk is further directed to place a copy of the civil Judgment in the criminal file.

3. Petitioner's Motion for a New Trial Under Rule 33 (Cr. Doc. #163; Cv. Doc. #28) and Motion to Request an Evidence Hearing (Cr. Doc. #166; Cv. Doc. #33) are **DENIED** for the same reasons stated above with regard to the Gmail contact name.

4. Petitioner's Motion to Compel (Cr. Doc. #165; Cv. Doc. #31) information on Google, Inc.'s Gmail feature to read Facebook text messages is **DENIED**.

5. Petitioner's Motions to Amend/add to Doc. # 1 Ground 4 Brady Claim (Cv. Docs. ## 39-40) are **GRANTED** to the extent that the arguments in the motions were considered above.

**IT IS FURTHER ORDERED:**

**A CERTIFICATE OF APPEALABILITY (COA) AND LEAVE TO APPEAL *IN FORMA PAUPERIS* ARE DENIED.** A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1); Harbison v. Bell, 556 U.S. 180, 183 (2009). "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004), or that "the issues presented were adequate to deserve

encouragement to proceed further," <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003)(citations omitted).  Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE and ORDERED** at Fort Myers, Florida, this 2nd day of May, 2019.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Petitioner
AUSA